**Nos. 14-1060, 14-1091**

# United States Court of Appeals
*for the*
# Federal Circuit

MOBILEMEDIA IDEAS LLC,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

APPLE INC.,

*Defendant-Appellant, Cross-Appellee.*

**Appeal from the United States District Court for the District of Delaware in Case No. 10-CV-258, Judge Sue L. Robinson**

## BRIEF OF PLAINTIFF-APPELLEE, CROSS-APPELLANT

Steven M. Bauer
Justin J. Daniels
Safraz W. Ishmael
John E. Roberts
John M. Kitchura, Jr.
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
Telephone: 617-526-9600

*Counsel for Plaintiff-Appellee, Cross-Appellant MobileMedia Ideas LLC*

March 20, 2014

# TABLE OF ABBREVIATIONS

MobileMedia adopts the Appellant's Abbreviations. Additional abbreviations used herein include:

| | |
|---|---|
| '231 Patent | U.S. Reissued Patent No. RE 39,231. A57690-706. |
| GSM 04.08 | European digital cellular telecommunications system (Phase 2); Mobile radio interface layer 3 specification (GSM 04.08). A57169-574. |
| GSM 04.83 | European digital cellular telecommunications system (Phase 2); Call Waiting (CW) and Call Hold (HOLD) supplementary services-Stage 3 (GSM 04.83). A57575-94. |
| POSITA | person of ordinary skill in the art |

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee, Cross-Appellant MobileMedia Ideas LLC certifies the following:

1. The full name of every party or amicus curiae represented by me is: MobileMedia Ideas LLC.

2. The name of the real party in interest represented by me is: MobileMedia Ideas LLC.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: MPEG LA, LLC, Nokia Corporation, and Sony Corporation of America.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Proskauer Rose LLP - Steven M. Bauer, Anthony C. Coles, Justin J. Daniels, Alan Federbush, Safraz W. Ishmael, John M. Kitchura, Jr., Timothy W. Mungovan, John E. Roberts, Kenneth Rubenstein, Elias Schilowitz, John C. Stellabotte.

   Morris, Nichols, Arsht & Tunnell LLP - Jack B. Blumenfeld, Rodger Dallery Smith, II, Jeremy A. Tigan.

   Quinn Emanuel Urquhart & Sullivan LLP (firm withdrawn as of March 30, 2012) - Edward J. DeFranco, Kevin P.B. Johnson, Alexander Rudis, Matthew Traupman.

Young, Conaway, Stargatt & Taylor, LLP (firm withdrawn as of February 9, 2012) - Adam Wyatt Poff, Michele Sherretta Budicak, Pilar Gabrielle Kraman.

Shaw Keller LLP (firm withdrawn as of February 9, 2012) - John W. Shaw.

Sullivan & Cromwell LLP (firm withdrawn as of March 29, 2012) - Garrard R. Beeney, Adam R. Brebner, Victoria A. Coyle, Marc De Leeuw, David Dehoney, Taly Dvorkis, Diana Iskelov, Jane J. Jaang.

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS .......... i

CERTIFICATE OF INTEREST .......... ii

TABLE OF CONTENTS .......... iv

TABLE OF AUTHORITIES .......... vii

STATEMENT OF RELATED CASES .......... 1

JURISDICTIONAL STATEMENT .......... 1

PRELIMINARY STATEMENT .......... 1

STATEMENT OF THE ISSUES .......... 4

A. ’078 (“Camera Phone”) Patent (claim 73) .......... 4

B. ’068 (“Call Handling”) Patent (claim 23) .......... 5

C. ’075 (“Call Rejection”) Patent (claims 5, 6 & 10) .......... 5

D. ’231 (“Call Alerts”) Patent (claims 2-4 & 12) .......... 6

STATEMENT OF THE CASE .......... 7

I. The Proceedings Below .......... 7

II. The Technology .......... 8

A. ’078 (“Camera Phone”) Patent .......... 9

1. The Patent/Infringement .......... 9

2. Prior Art/Validity ... 14

B. ’068 (“Call Handling”) Patent ... 21

1. The Patent/Infringement ... 21

2. Prior Art/Validity ... 24

C. ’075 (“Call Rejection”) Patent ... 26

1. The Patent/Infringement ... 26

2. Prior Art/Validity ... 29

D. ’231 (“Call Alerts”) Patent ... 31

1. The Patent/Infringement ... 31

SUMMARY OF THE ARGUMENT ... 35

STANDARDS OF REVIEW ... 37

ARGUMENT ... 40

I. The ’078 (“Camera Phone”) Patent: The District Court’s Decision Upholding The Verdict Of Infringement And Validity Should Be Affirmed ... 40

A. The District Court Correctly Found That The Structure For The “Means…For Transmitting” Was Not Limited To A Telefax Modem ... 40

B. The District Court Correctly Found That The Structure For The “Means For Processing And For Storing…” Need Not Be “Dedicated” To Performing *Only* Those Two Functions ... 50

C. Substantial Evidence Supports The Jury's Finding That The '078 Patent Was Not Obvious ................................ 54

II. The '068 ("Call Handling") Patent: The District Court's Decision Upholding The Verdict Of Infringement And Validity Should Be Affirmed ........................................................ 64

A. The District Court Correctly Construed "Listing" To Encompass A List In The Form Of A Matrix ........................ 64

B. Substantial Evidence Supports The Jury's Finding That The '068 Patent Was Not Obvious ................................ 69

III. The '075 ("Call Rejection") Patent: The District Court Should Not Have Overturned The Verdict Of Infringement And Validity ............................................................................ 73

A. The District Court Misapplied Its Claim Construction In Overturning The Verdict Of Infringement ....................... 73

B. The District Court Erred By Granting JMOL Of Invalidity ........................................................................... 78

IV. The '231 ("Call Alerts") Patent: The District Court's Summary Judgment Of Non-Infringement Should Be Vacated ........................................................................................ 84

A. The District Court Wrongly Construed "To Change A Volume" In The Independent Claim To Exclude The Subset "Stopping The Sound," Which Was In A Dependent Claim ................................................................. 84

CONCLUSION ....................................................................................... 89

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) .......... 70

*Agrizap, Inc. v. Woodstream Corp.*,
520 F.3d 1337 (Fed. Cir. 2008) .......... 39

*Al-Site Corp. v. VSI Int'l, Inc.*,
174 F.3d 1308 (Fed. Cir. 1999) .......... 70

*Alcon Research, Ltd. v. Apotex, Inc.*,
687 F.3d 1362 (Fed. Cir. 2012) .......... 87

*B. Braun Medical, Inc. v. Abbott Labs.*,
124 F.3d 1419 (Fed. Cir. 1997) .......... 49

*Crocs, Inc. v. Int'l Trade Com'n*,
598 F.3d 1294 (Fed. Cir. 2010) .......... 38

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
567 F.3d 1314 (Fed. Cir. 2009) .......... 38

*Energy Transp. Group, Inc. v. William Demant Holding A/S*,
697 F.3d 1342 (Fed. Cir. 2012) .......... 37

*Fonar Corp. v. General Elec. Co.*,
107 F.3d 1543 (Fed. Cir. 1997) .......... 49

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
355 F.3d 1327 (Fed. Cir. 2004) .......... 42

*In re Chapman*,
595 F.3d 1330 (Fed. Cir. 2010) .......... 38

*Intamin Ltd. v. Magnetar Techs., Corp.*,
483 F.3d 1328 (Fed. Cir. 2007) .......... 87

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) .......... 58

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .......... 62, 69

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
545 F.3d 1340 (Fed. Cir. 2008) .......... 78

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
2012-1014, 2014 WL 667499 (Fed. Cir. Feb. 21, 2014) (en banc) .......... 38

*Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.*,
248 F.3d 1303 (Fed. Cir. 2001) .......... 48, 49

*Micro Chem. Inc. v. Great Plains Chem. Co.*,
194 F.3d 1250 (Fed. Cir. 1999) .......... 45, 53

*PharmaStem Therapeutics Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007) .......... 64

*Pitts v. Delaware*,
646 F.3d 151 (3d Cir. 2011) .......... 37

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
400 F.3d 901 (Fed. Cir. 2005) .......... 45

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
711 F.3d 1348 (Fed. Cir. 2013) .......... 39

*Saffran v. Johnson & Johnson*,
712 F.3d 549 (Fed. Cir. 2013) .......... 49

*Starceski v. Westinghouse Elec. Corp.*,
54 F.3d 1089 (3d Cir. 1995) .......... 39

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
617 F.3d 1296 (Fed. Cir. 2010) .......... 58

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
392 F.3d 1325 (Fed. Cir. 2004) .......... 43

*Versata Software, Inc. v. SAP Am., Inc.*,
717 F.3d 1255 (Fed. Cir. 2013) .......... 67

*Vizio, Inc. v. Int'l Trade Comm'n*,
605 F.3d 1330 (Fed. Cir. 2010) .......... 66

*Western Union Co. v. Moneygram Payment Sys.*,
626 F.3d 1361 (Fed. Cir. 2010) .......... 63

**STATUTES**

35 U.S.C. § 103 .......... 38, 63

35 U.S.C. § 112 .......... 87

**OTHER AUTHORITIES**

Fed. Cir. Rule 25(a) .......... 91

Fed. Cir. Rule 32(b) .......... 90

Fed. Cir. Rule 47.5 .......... 1

Fed. R. App. P. 32(a) .......... 90

Fed. R. Civ. P. 54(b) .......... 8

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, no other appeal in or from the same civil action was previously before this or any other appellate court, and counsel for MobileMedia knows of no case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal or cross-appeal.

## JURISDICTIONAL STATEMENT

MobileMedia adopts the Appellant's Jurisdictional Statement. In addition, and for the same reasons, this Court has subject-matter jurisdiction to hear this cross-appeal.

## PRELIMINARY STATEMENT

In *today's* world, "smartphones" are ubiquitous. Today, the market is dominated by phones having features like cameras, music, call management, and voicemail. However, *in the 1990s*, when Nokia's and Sony's engineers made the inventions patented here, the industry was in its infancy, and Apple was still 15 years away from even entering the phone market. Phones were large and clunky, their segmented displays had limited capacity, and users needed to memorize push-button sequences to accomplish much of what they wanted. Apple

seems to suggest here on appeal that the cell phone industry has moved so quickly over the last twenty years that none of its innovation was patentable invention, because everything new was just the next logical (or "obvious") development over what was done before.

Sony and Nokia jointly formed MobileMedia (along with a third party, MPEG LA) to monetize Sony and Nokia patents resulting from their foundational work. At trial, MobileMedia asked the jury to put aside what they knew about these phones today, and to go back 20 years, to the early 1990s, to understand what one of ordinary skill would have known and been able to do *at the time*. Witnesses from Nokia and Sony explained to the jury how their companies helped create this new industry in the 1990s, and the jury learned that:

Nokia's '078 ("Camera Phone") Patent (1994) was the *first* patent to disclose and claim a tightly-integrated, multi-functional camera phone which permitted a user not only to collect images, but to display, process, store and transmit those images over wireless networks;

Sony's '068 ("Call Handling") Patent (1996) was the *first* patent to disclose and claim a method for making it easier for a user to manage

multiple calls, by allowing the user to display call processing options in a *single* selection operation; and

Nokia's '075 ("Call Rejection") Patent (1998) was the *first* patent to disclose and claim how a phone could politely reject a second incoming phone call, when the phone was already active on a first call.

At trial, MobileMedia proved that Apple's iPhone directly infringed these three patents, and Apple failed to prove that its prior art rendered the claimed inventions obvious, *at the time* of the invention. The jury reached its verdict on the evidence.

Apple now appeals the district court's denial of its JMOL motion on Nokia's '078 Patent and Sony's '068 Patent. MobileMedia cross-appeals the court's grant of Apple's JMOL motion overturning the jury's verdict on both infringement and validity of Nokia's '075 Patent; and its grant of summary judgment of non-infringement of Sony's '231 ("Call Alerts") Patent, which claims a mobile phone that permits a user to quiet or stop an alert sound (such as a ringtone) associated with an incoming call.

## STATEMENT OF THE ISSUES

### A. **’078 (“Camera Phone”) Patent (claim 73)**

1) Whether the district court correctly construed the structure for the term “means for transmitting image information…using a radio frequency channel” to be a “cellular mobile phone unit” (as MobileMedia urged), or should have limited it to a telefax modem (as Apple urged).

2) Whether the court correctly construed the structure for the term “means for processing and for storing at least a portion of the image information obtained by the camera unit” to be an “image processing unit and memory unit,” without requiring that the image processing and memory units be “dedicated” to, and solely used for, the camera, as Apple urged.

3) Whether the court correctly found that the jury’s finding that claim 73 was not obvious in view of *Kyocera* and *Lucent* was supported by substantial evidence, where MobileMedia’s evidence showed the *key* limitations missing from the prior art, and MobileMedia’s expert testified that a POSITA would not have combined the references.

**B. ’068 (“Call Handling”) Patent (claim 23)**

4) Whether the court correctly construed “listing said processing items…” to mean “the processing items are grouped together in an orderly fashion” (as MobileMedia urged) rather than “a series of processing items displayed one after another” (which Apple says would exclude a list of items in a “matrix” layout, even though the patent describes a matrix as a subset of a list).

5) Whether the district court correctly found that the jury’s finding that claim 23 was not obvious in view of *Bayless* (standing alone) was supported by substantial evidence, where MobileMedia’s evidence showed the *selection operation* missing from *Bayless*, and MobileMedia’s expert testified that a POSITA would not have thought to modify *Bayless* to create the invention, given the state of the art at the time.

**C. ’075 (“Call Rejection”) Patent (claims 5, 6 & 10)**

6) Whether the district court erred when, after trial, it granted Apple’s JMOL motion of non-infringement, even though it agreed there was evidence on which the jury could reach its verdict in view of the

claim construction relating to what it means for "the wireless system…to immediately release the incoming call…"

7) Whether the district court erred in granting Apple's JMOL motion that claims 5, 6 and 10 of the '075 Patent were obvious in view of *GSM 04.08* and *GSM 04.83* and/or the *'068 Patent*, even though it found there was substantial evidence for the jury verdict of non-obviousness, based on its view that the prior art references were obvious to combine in one order.

**D. '231 ("Call Alerts") Patent (claims 2-4 & 12)**

8) Whether the district court erred in construing the term "to change a volume of the generated alert sound" to mean "to alter the degree of loudness of the alert sound that is being generated without cutting off the telephone circuit," and then excluding from that definition stopping playback of the ringtone, even though stopping playback is the subset of this term claimed in dependent claim 2, and is disclosed in the patent.

9) Whether the district court erred in granting Apple summary judgment of non-infringement based on its erroneous construction.

# STATEMENT OF THE CASE

## I. The Proceedings Below

There are four patents on appeal here – the ’078 and ’068 (Apple’s appeal), and the ’075 and ’231 (MobileMedia’s cross-appeal).

In November, 2012, the district court issued a memorandum and order on claim construction and summary judgment. The court denied Apple’s motions for summary judgment of invalidity of the ’078, ’068, and ’075 Patents, finding factual disputes; and granted Apple’s motion for summary judgment of non-infringement of the ’231 Patent, based on its claim construction. A70-71,86-125; A203-13.

After the case was pared down by summary judgment and the parties’ agreement to narrow the issues for trial, the case went to trial on claim 73 of the ’078 Patent, claims 23 and 24 of the ’068 Patent, and claims 5, 6 and 10 of the ’075 Patent. The jury returned a verdict of direct infringement and validity for each of the asserted claims. A18605-12; A20797-801(1719:6-1723:10).

After trial, the district court denied Apple’s motion for a new trial and found substantial evidence supporting the verdict of infringement and validity on the ’078 Patent and claim 23 of the ’068 Patent.

However, the district court granted JMOL to Apple with respect to the ’075 Patent and claim 24 of the ’068 Patent.

On October 3, 2013, the district court entered its Rule 54(b) final judgment. A1-5. These appeals followed.

## II. <u>The Technology</u>

In the 1990s, Sony and Nokia were at the forefront of cellular technology research and development. To put the timing into context, back then, Sony needed to develop cellular network *simulators* because the cellular network for these phones was not yet even publicly available. While Sony was doing its work in Japan and the U.S., Nokia was independently developing its new cellular telephones primarily in the U.S. and Finland. A19391-92(313:24-314:6); A19396-400(318:5-322:8); A19411(333:8-25); A19419-21(341:25-343:24); A19424-33(346:10-355:20); A19435-36(357:25-358:2); A19441-42(363:10-364:11); A19446 (368:18-369:7); A57003.

In 2010, Sony, Nokia, and MPEG LA (one of the U.S.’s most successful operators of patent pools for technologies such as MPEG digital compression and the ATSC digital television standard) formed

MobileMedia to facilitate licensing of some of this fundamental technology. A179-85; A1181-484.

Apple did not release *its* first phone (the iPhone) until 2007, years after Sony and Nokia had introduced their cellular phones with modern smartphone capabilities. A19397(319:8-21); A19426-67(348:10-349:23); A19430-31(352:19-353:19); A19446-47(368:18-369:7). Late to the cellular phone market, Apple's theory at trial seemed to be that it developed the iPhone in a technological vacuum, without regard to the years of development that took place before.

The jury found that the iPhone infringed all three asserted patents. Apple agrees in its opening brief that there were no factual disputes at trial as to how the Apple technology works. Apple's non-infringement appeal thus turns solely on its efforts to have this Court adopt the narrow claim constructions it proposes for certain claim terms.

## A. ’078 (“Camera Phone”) Patent

### 1. The Patent/Infringement

In 1994, digital cameras and mobile phones were progressing down different development paths. Nokia's ’078 Patent (priority date

May 19, 1994) is the first patent to claim a tightly-integrated, multi-functional combined camera and telephone which permits a user not only to collect image data, but to process, display, store and transmit that data over wireless networks. A21062(Abstract); A21066(1:10-17). Apple argues here that in 1994, the prior art field was "crowded," but nowhere in this appeal does it suggest that there was *any* anticipatory reference invalidating the '078 Patent.[1]

Claim 73 claims this integrated combined camera and cell phone:

> A portable cellular mobile phone comprising:
>
> [a] a built in camera unit for obtaining image information;
>
> [b] …;
>
> [c] a display for presenting image information obtained by the camera unit;
>
> [d] a microprocessor adapted to control the operations of the camera unit in response to input signals from the user interface, and to process image information received by the camera unit; and

---

[1] As "evidence" that this was a "crowded" field, Apple cites to *videophones*, which are not camera phones at all. Apple-Br. 9 n.1. Its expert conceded on cross-examination that these videophones were not the same as the invention in the '078 Patent. A20400-01(1322:18-1323:4). The jury was therefore free to conclude that poorly working videophones did not lay the groundwork for a fully-functioning integrated camera-telephone.

[e] *means, coupled to said microprocessor, for transmitting image information processed by said microprocessor to another location using a radio frequency channel*; and

[f] wherein the camera unit comprises:

[f1] optics…;

[f2] an image sensor…; and

[f3] *means for processing and for storing at least a portion of the image information obtained by the camera unit for later recall and processing*.

A21073(16:1-18). Apple's two claim construction arguments relating to elements [e] and [f3] are highly technical, each time trying to limit the claim to one embodiment in the patent. First, it argues that the element [e] "means,…for transmitting image information…using a radio frequency channel" can *only* be a telefax modem; and second, that the element [f3] "means for processing and for storing…the image information" must be dedicated *solely* to those roles in the camera unit, and cannot perform any other function. Apple's technical explanation of this patent is supported only by litigation counsel's argument – Apple offered no expert testimony during the *Markman* process in its support.

The technical description that follows will be focused on these two issues.




FIG.1

The ’078 Patent teaches an integrated microprocessor-run camera phone that includes a camera unit 14 (that itself includes a camera 14a and optics 14b), and a display 9 that can display images. A21067-68(3:5-35;5:14-25). The camera unit collects data – such as “an image taken of the surroundings, for instance of a person” – and includes a microprocessor and memory unit that can process and store the image information. A2106(3:19-20).

Although the patent describes the microprocessor and memory unit as *parts* of the camera unit, the patent says nothing about these components being dedicated *solely* to performing functions within the camera unit. Nevertheless, Apple argues that the claim should be *functionally* limited to a microprocessor and memory having no use other than for the camera function, solely because the patent shows

these elements *physically* in the camera unit. In other words, according to Apple, if the memory is used for *anything* other than the storage of image data, it is not within the scope of the structure. There is no support for its technical argument.

As for Apple's other claim construction issue, the patent teaches that once the camera processes and saves the image, the device can transmit the image via a "radiotelephone, i.e. cellular mobile phone unit 17…" A21067(3:37-41); and 3:45-46 (explaining that the cellular mobile phone unit can transmit "[b]oth data and speech")). The patent then discusses the two types of cellular telephone networks available in 1994 – analog and digital (GSM) networks. The patent notes that because *analog* cellular networks in 1994 could be slow, a modem "preferably" could be connected to the phone to facilitate transmission. A21067(3:41-43). *But*, in a digital network, the patent says, the phone can transmit the image via other forms of digital interfaces, such as by email:

> When cellular mobile phone unit 17 of the notebook computer and the related cellular mobile phone controller 8 are *implemented as a digital GSM system*, the user can transmit SMS messages (Short Message Service). The user writes the message to the notebook computer using the keyboard or a pen on the digitizer pad, *or* the message

> reading *is read by the data collection device such as camera unit 14.* After the message has been *transmitted via a cellular mobile phone* to a GSM short message centre, it is forwarded to the recipient.

A21069(8:5-17).[2] The patent continues:

> The notebook computer further comprises a radiotelephone, i.e., *cellular mobile phone unit 17*, preferably as an Integrated part thereof. It is connected to cellular mobile phone controller 8 of data processing unit 2 and to receiver/transmitter antenna 18. In the case of a telephone set operating in an *analogue cellular network, a modem is preferably connected* to cellular mobile phone unit 17. Cellular mobile phone unit 17 is based on the standard cellular mobile phone technology. Both *data* and speech *can be transmitted via integrated cellular mobile phone unit 17.* The data transmission properties are based on an analogue modem and *the GSM data interface*, for instance, the technology of both of them being conventional.

A21067(3:37-49). Thus, the patent describes the advantage of a modem for analog circuits, but says that the cell phone alone can transmit digital image data on a *digital* (GSM) phone network.

### 2. <u>Prior Art/Validity</u>

Apple has no single reference that shows a *combined* personal communicator and camera that includes a data processing unit, data transmission units, memory units, a display for displaying pictures

---

[2] Throughout this brief, italicized emphasis in quotations is added for purposes of argument, unless specifically noted as having been in the original.

captured by the camera, and a user interface. A21066(1:10-17). Apple reargues its validity case here on appeal, as though its lawyers' argument substitutes for the expert's evidence – saying that *Kyocera* and *Lucent together* show all the elements of the patent. Yet Apple has no *evidence* to support this statement.[3]

*Kyocera*, Apple's "closest" reference and on which it hinged its obviousness case, in fact probably killed the "obviousness" case in the jury's view. *Kyocera* is a Japanese patent application dated just six days before the priority date of the '078 Patent. As such, *Kyocera* showed the jury *exactly* what the state of the art was when Nokia's engineers made *their* invention – *Kyocera* merely physically combined a camera and a cell phone into a single box, *without* integrating the electronics. Although Apple argued that integrating the electronics was "obvious" in 1994, the jury saw that *Kyocera* itself had not mentioned it, a mere six days earlier.

*Kyocera*, in fact, did not address *how* to integrate a camera and cell phone, because it was not focused on a camera phone, but on fixing

---

[3] Notably, the arguments Apple makes here are the same ones it made at the PTO in a reexamination it brought there. At trial, the jury learned that the PTO had reexamined and allowed claim 73 over the same *Kyocera* and *Lucent* references. A20414-22(1336:13-1344:3).

a memory storage problem for pictures on digital cameras. In 1994, digital cameras were not particularly useful because they did not have sufficient memory to store a large number of photographs: "there exists the problems that the number of images that can be stored in memory cards is few and they are still quite expensive." A57598. *Kyocera* added a "mobile telephone function to an electronic camera," so that the *Kyocera* camera "can compensate for the limited storage memory of memory cards" by "enabl[ing] *immediate transmission* of photographed images to a large-scale storage medium located in another place using telephone lines." A57599. That is, *Kyocera* solved this memory problem by physically combining a conventional electronic camera with its standard camera control circuit architecture (Fig.10), with a cellular telephone (Fig.11), resulting in a combined device (Fig.1) which was not *electronically* integrated.




*Kyocera* Prior Art Camera, Fig.10(A57612)




*Kyocera* Prior Art Cell Phone, Fig.11(A57612)




*Kyocera*, Physical Colocation of the Two, Fig.1(A57609)

The jury heard that *Kyocera* did not disclose claim limitation [d], because the "control circuit 25" that Apple's expert identified as meeting this limitation was not a "microprocessor," but was merely a switch that controls other circuits, and was not adapted to "process image information received by the camera unit" as limitation [d] requires. A20457-58(1379:16-1380:15). It also heard that *Kyocera* was missing limitation [f3] because it did not store images for "later recall and processing," but instead taught *immediate* transmission of the image to

a memory device at another location. A20457-60(1379:16-13:80:15; 1381:12-1382:17).[4]

Where *Kyocera* was missing claim limitations [d] and [f3], Apple now argues that *Lucent* discloses the missing pieces. But, Apple's expert never testified that *Lucent* had limitations [c] or [f3]. There simply was no trial testimony from Apple's expert that *Lucent* included either of these elements.

While *Lucent* includes a camera and a phone, it is not a "camera phone," in that it is not a device that displays pictures captured by a camera.[5] A57613-21. According to the patent, *Lucent* was intended for professions such as insurance adjusters and architects, who may need to capture pictures with a cheap portable device, to then send back to the office for analysis. Thus, *Lucent* describes an "image communication system" that is used to capture an image and then send it to a remote location, such as a remote fax machine. A57619(3:10-19).

---

[4] Although Apple's expert testified that these elements *were* present in *Kyocera*, he did so only in conclusory form, and Apple does not argue here that *Kyocera* was anticipatory.

[5] While *Lucent* discloses an LCD display 215, this display functions to display alphanumeric information – *not* pictures – "to provide the user with a visual indication of the operating modes and status of the device." A57619(4:18-22).

FIG. 1




*Lucent*, Fig.1(A57614)

There is no question here that in 1994, the "*embedded system*, taking the camera, mobile phone together, [forming] one nicely *integrated unit*…" of the '078 Patent was unique. A19615(537:21-24). Because Apple concedes now that *Kyocera* was missing element [d] and *Lucent* was missing element [c], and given the substantial (if disputed) evidence that neither included element [f3], the jury was well within its right to find that Apple had not proven the two, taken together in 1994, rendered the invention obvious, just as the PTO found in reexamining the patent in view of these same two references.

## B. <u>’068 (“Call Handling”) Patent</u>

### 1. <u>The Patent/Infringement</u>

Sony’s ’068 Patent (1996) discloses a method for handling multiple incoming calls on a telephone.

In 1996, if a user was on a first call when a second call came in, the user had to press a *series* of pre-memorized keys to manage the two calls. A32738(1:14-38). For example, on some phones, pressing 1 followed by “send” would place the first call on hold and activate the second call. *Id*.

The patent describes and claims an easier way for a user to manage multiple calls. Rather than having to memorize ordered multi-key sequences, the patent teaches displaying *on the user’s screen* the options available for processing each call. A32738(1:62-67;2:1-7). The user then navigates through the *displayed* processing options and selects and determines (*i.e.*, activates) the desired one.

The invention could not easily use prior art solutions using full-size keyboards connected to personal computers because cell phones had little physical space: “…[O]n a cellphone, ease of use is very important.

On a computer with a full keyboard, you have different issues that you may want to give greater weight to." A20491-92(1413:24-1414:2).

Claim 23 claims:

> A communication method for controlling a connecting state of a call into a desired connecting state upon a predetermined operation by a user, comprising the steps of:
>
> [a] displaying processing items available to the user relative to the call on a display;
>
> [b] selecting and determining a desired processing item out of said processing items displayed on said display by the user operating an input unit; and
>
> [c] controlling the processing items being displayed on said display…, wherein said step…*includes displaying said processing items on said display when only a single predetermined selection operation is made by the user*,
>
> [d] wherein said step of controlling the processing items includes *listing said processing items available to the call on said display for each call.*

A32751(4:17-36).

In support of its claim construction argument regarding element [d] above, and particularly what it means to "list" items, Apple raises solely a *semantic* dispute – whether displaying processing items in a "matrix" format (as Apple concedes the iPhone does) can be considered "listing" those items. The district court rejected Apple's argument, and

for good reason – the patent's fourth embodiment illustrates processing items displayed in "a list in which processings for each call are *arranged in a matrix*." A32744(13:3-5); A91.

The patent discloses five embodiments. In the first three, an incoming call triggers the system to display "processing items" (such as to "Activate" the incoming call; "Disconnect" the incoming call; or start a "Multi-Party" conference). A32743(12:42-44); A32732(Figs.6A-B); A32734(Figs.8A-B); A32735(Figs.9A-B). The user can scroll through the available processing items to select and determine the preferred one. A32743(11:35-46); A32745(16:19-22).

In the fourth and fifth embodiments, the display of processing items is triggered, not by a new incoming call, but by the user pressing a "call control key" ("TURN ON CALL CONTROL KEY"). A32743 (12:44-53); A32745(15:38-45); A32736(Figs.10A-B); A32737(Figs.11A-E). In the fourth embodiment, when the user presses the key, processing items are displayed in a "list in which processings for each call are arranged in a matrix." A32744(13:1-5). That is, a combination of processing options for both calls are displayed together as a single processing item on the screen in a double-columned "matrix."

A32744(13:12-28). The "list" explicitly encompasses the "matrix" concept because a list is a matrix with a single row or column. A32744(13:3-5); A32736(Figs.10A-10D):

FIG. 10A
FIG. 10B
FIG. 10C
FIG. 10D




In the fifth embodiment, the display is again triggered by the user pressing a "call control key," but the processing items are displayed in a single column. A32737(Figs.11A-11F).

### 2. Prior Art/Validity

At trial, Apple argued that *Bayless*, alone, rendered claim 23 obvious. In support, Apple presented but a single conclusory statement

that "one of skill in the art would just know from the field that this is something that ordinarily would be done, so it would be obvious to do that." A20045(967:7-10). Of course, the lone conclusory statement of its expert is insufficient as a matter of law to overcome the substantial evidence the jury heard to the contrary.

MobileMedia's expert testified that the "Hotkey" in *Bayless* is actually two keyboard selection operations, requiring *two* physical keys to be pressed in a *serial sequence* – "Ctrl" followed by "0." He also explained that the computer keyboard-user interface of *Bayless* addressed different design challenges when compared to the cellphone of the '068 Patent, and thus taught away from the claimed invention. A20486-88(1408:12-1410:20); A20558-59(1480:12-1481:13); A20490-92 (1412:25-1414:5).

And, the jury heard that in March 2012, the PTO completed a reexamination of the '068 Patent, allowing the amended claim 23 asserted at trial over the same *Bayless* reference. A32749; A20093-95(1015:24-1017:1); A43439; A43441; A34156.

## C. ’075 (“Call Rejection”) Patent

### 1. The Patent/Infringement

Nokia’s ’075 Patent (1998) teaches a system for rejecting a second phone call coming into a mobile phone, when the phone is already active on a first call. In 1998, wireless systems did not allow users to “reject” the second incoming call when the user was already on a first call. The user instead had two choices – let the second call ring some number of times (“ring out”) or turn the phone off. A43462(2:36-53).

The invention allowed the user a third choice – to press a key which would then cause the incoming call to go directly to voicemail, rather than waiting for the call to ring out. By pressing this predetermined key, the phone would send a “rejection message” to the cell tower, indicating to the wireless system that it should immediately release (or drop) the second incoming call because the phone was busy. A43462(2:1-18, 2:36-53); A43463(3:57-4:8).

Claim 10 claims this invention:

> In a mobile communications device, apparatus in communication with a first calling station for selectably rejecting an incoming call, said apparatus comprising:
>
> [a] a transceiver…receiving a transmission signifying that an incoming call is being attempted; and

> [b] a control processor coupled to said transceiver, said control processor for determining if said incoming call is to be rejected, and, in response to a positive determination, said control processor for outputting a rejection message to said transceiver for transmission to said remote transceiver,
>
> [c] wherein *said rejection message comprises at least one information element indicating to the wireless system that the wireless system is to immediately release the incoming call on the communication channel between the mobile communications device and remote transceiver.*

A43471(1:26-45).

According to the claim, when a mobile phone is active on a first call (preamble), when a second caller attempts to call the device (element [a]), and a determination is made that the second call is to be rejected (element [b]), a rejection message is transmitted to the remote transceiver (such as the cell phone tower) (element [c]). Element [c] describes the format of the "rejection message" as comprising "at least one information element indicating to the wireless system that the wireless system is to *immediately release* the incoming call on the communication channel between the mobile communications device and remote transceiver." A43471(1:40-45).

The district court construed the term "immediately release" as not referring to a time period, but to a particular action; namely, "without requiring any additional action by or communication from the mobile phone." A101-02. This construction required no time period, and did not preclude intermediate action by the remote transceiver – the call was "immediately released" when the system was directed to release a call without further action required from the *mobile phone*. *Id.*

At trial, the jury heard how the iPhones infringe claim 10 (as well as method claims 5 and 6):

*first*, when the iPhone is on a first call, and a second call arrives, the user has the option to reject that incoming call by tapping the "Ignore" icon on the screen, or alternatively, by pressing the power key twice. A19641-43(563:17-565:12); A19648-49(570:17-571:15).

*second*, when the iPhone processor recognizes one of these inputs, it sends a "DISCONNECT" request to the cell tower (the "rejection message"). A19648-60(570:13-582:13).

*third*, when the cell tower receives this "DISCONNECT" message, it sends a "RELEASE" message back to the iPhone and starts a timer. When that timer expires twice, the second call is released, without

additional action or communication from the phone. That is, the "DISCONNECT" message *alone* includes information sufficient to cause the wireless system to release the call, without requiring additional action by or communication from the mobile phone. A19660-81; A20164-65(582:14-596:24, 597:2-603:23).

### 2. **Prior Art/Validity**

Again, Apple showed the jury no single reference that it contended anticipated this invention. Instead, it pointed to two separate documents issued by the European Telecommunication Standards Institute ("ETSI"), "*GSM 04.83*" and "GSM *04.08*," and to MobileMedia's *'068 Patent*, which it argued rendered the invention obvious.

*GSM 4.83* describes communications protocols for call waiting and call holding on systems with multiple active phone calls. A57575. *GSM 4.08* relates generally to telecommunications protocols for exchanging messages between a base station and a mobile phone, and in some instances for releasing a call active between the base station and the mobile phone. A32727. The *'068 Patent* asserted as prior art, is the same MobileMedia patent that Apple is accused of infringing here. It

concerns a device and user interface to manage multiple active phone calls.

While Apple's expert testified that a POSITA would have thought the invention obvious in view of these references, the jury heard contrary factual testimony from MobileMedia's expert. In particular, the jury heard that the GSM documents had been public for two to three years, but that no one in that time *had* combined the two, even though the need was manifest. A20481-84(1403:22-1406:5). They also heard that *GSM 04.08* expressly limits its discussed activity to incoming calls when the mobile phone equipment was not on an active call ("equipment sending this cause is neither busy nor incompatible"):

> H.1.9 Cause No. 21 "call rejected"
>
> This cause indicates that the equipment sending this cause does not wish to accept this call, although it could have accepted the call because the equipment sending this cause is neither busy nor incompatible.

A57560.

And, the jury heard that the PTO allowed the asserted claims over *GSM 4.08*, after reexamination, citing the same paragraph excerpted above in its reasoning. The jury heard that while the PTO did not cite *GSM 4.83* in its reasoning, the examiners were aware of similar prior art teaching call waiting and multiple active calls; indeed, the '075

Patent itself disclosed call-waiting as prior art. A20559-10(1481:14-1482:10); A43462-63(2:54-3:3).

Having heard this evidence, the jury found that Apple failed to prove that the patent was obvious. Yet, the district court overturned the verdict, even though it expressly found that there *was* substantial evidence that *GSM 4.08* teaches away from combinations with *GSM 4.83* and/or the *'068 Patent*. Nevertheless, it held that a POSITA would have found the invention obvious if, instead of starting with GSM 4.08, he had "*start[ed]* with *GSM 04.83* and follow[ed] its instructions to use *GSM 04.08*…" A27-28.

### D. '231 ("Call Alerts") Patent

#### 1. The Patent/Infringement

Sony's '231 Patent (1994) was not tried because the district court entered summary judgment of non-infringement based on an erroneous claim construction.

The '231 Patent, which reissued on August 8, 2006, and received a reexamination certificate on April 3, 2012, after amendment, teaches a communication terminal (such as a cellphone) that permits users to stop an alert sound for an incoming call (such as a ringtone) without

notifying the caller. In contrast to the '075 Patent (discussed above) which addressed what a user could do in 1998 when a *second* call came in, this patent addressed what the user could do in *1994* when a *first* call came in. In 1994, the user had two options for quieting the ring of the *first* call: either answer the call or turn off the power. But the user might not want to do either – each could be inconvenient and the latter could tip off the caller that the user rejected the call. A57696(1:17-42).

The '231 Patent solved this problem by permitting a user to quiet or silence a ringtone without answering the call *and* without powering down the device. With the invention, the caller perceives that the user's phone is still ringing normally, even though the user had silenced the ringer. It may be "obvious" now, but it was not *in 1994*.

The specification provides two separate, alternative means for quieting unwanted ringtones – *stopping* the alert sound and *reducing* its volume. A57697-98(4:67-5:1) For example, the ringtone can be *stopped* (A57697(3:1-6); A57693,Fig.3,No.ST5 ("Stop Alert Sound")):




FIG. 3

Also the volume can be *reduced* (A57697(4:37-47);A57694,Fig.4,No.ST15 (“Reduce Volume of Alert Sound”)):




FIG. 4

A268(5:8-9,34-35).

Those alternatives are reflected in Claim 12 and dependent claims 2 and 3:

> 12. A communication terminal for informing a user of a received call from a remote caller by an alert sound, comprising:
>
> [a] an alert sound generator for generating the alert sound when the call is received from the remote caller;
>
> [b] control means for controlling said alert sound generator;
>
> ...;
>
> [d] wherein said alert sound generator is generating the alert sound and..., said control means controls said alert sound generator *to change a volume of the generated alert sound* only for the received call, without affecting the volume of the alert sound for future received calls, while leaving a call ringing state, as perceived by the remote caller, of the call to the terminal from the remote called unchanged,...
>
> ...
>
> 2. The communication terminal according to claim 12, wherein said control means controls the state of said alert sound generator *to stop the sound.*
>
> 3. The communication terminal according to claim 12, wherein said control means controls the state of said alert sound generator *to reduce the volume of the sound.*

A57703(2:11-39;1:31-38). That is, while claim 12 refers "*to changing a volume of* the sound," dependent claims 2 and 3 break "change the

volume" into its two alternatives – *stopping* the sound (claim 2); and *reducing* the volume of the sound (claim 3).

At Apple's urging, however, the district court construed independent claim 12's "to change a volume of the generated sound" to be an *alternative* to dependent claim 2's "stopping the sound" – as opposed to being the superset of claim 2 and claim 3's "reduce the volume." The court noted that the specification "discusses alternative embodiments that have the functionality of reducing an alert sound's volume or stopping the generation of an alert sound," A211, but excluded the "stopping the sound" functionality (which is what the iPhone does) from its construction of "to change a volume." On this basis, it then granted summary judgment of non-infringement.

## SUMMARY OF THE ARGUMENT

As to infringement of the '078 and '068 Patents, Apple merely reargues the same claim construction case it did below. But, the court's claim constructions are correct, and the infringement judgment should stand.

As to the validity of the '078 and '068 Patents, Apple offers no anticipatory reference. As to obviousness, Apple points to no legal

error, and merely re-argues the case it already made to the jury, saying here that the jury should have believed its experts, rather than MobileMedia's. The evidence given to the jury more than sufficiently supported the jury's finding that Apple failed to provide clear and convincing evidence that the patents were obvious.

With respect to the '075 Patent, the district court was wrong to grant JMOL on validity and infringement given the substantial evidence the jury had before it. On infringement, the court misapplied the claim. MobileMedia's infringement evidence directly tracked the claim language, and the court should not have overturned the infringement finding. On validity, the court was wrong to grant JMOL, once it found that the jury *had* sufficient evidence to find the claim was not obvious when *GSM 4.08* was considered in view of *GSM 4.83*. On the *evidence*, the court could not substitute its own view that the claim was obvious when it considered the prior art in a different order– *GSM 4.83* in view of *GSM 4.08*. There was no evidence to support (and no law to justify) a finding that obviousness turned on the *order* that the references were considered.

Finally, with respect to the '231 Patent, the district court's mistaken claim construction resulted in it improperly granting summary judgment of non-infringement. The court could not properly construe "changing the volume" in independent claim 12 to exclude the dependent claim's subset of that term, "stopping the sound."

## STANDARDS OF REVIEW

The Federal Circuit reviews JMOL and summary judgment decisions under the law of the regional circuit. *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1350 (Fed. Cir. 2012).

> The Third Circuit…view[s] the record evidence in the light most favorable to…the verdict winner, and drawing all reasonable inferences in his favor. We have cautioned that a court should grant judgment as a matter of law "sparingly."…A court must not weigh evidence, engage in credibility determinations, or substitute its version of the facts for the jury's. Only if the record is "critically deficient of the minimum quantum of evidence" upon which a jury could reasonably base its verdict will we affirm a court's grant of judgment as a matter of law.

*Pitts v. Delaware*, 646 F.3d 151, 155 (3d Cir. 2011).

Claim construction is a question of law that is reviewed *de novo*. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 2012-1014, 2014 WL 667499, at *1 (Fed. Cir. Feb. 21, 2014) (en banc).

A claim is obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made…" 35 U.S.C. § 103(a). For example, non-obviousness may be found where the prior art teaches away from the claimed invention. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009) ("An inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements"); *Crocs, Inc. v. Int'l Trade Com'n*, 598 F.3d 1294, 1309-10 (Fed. Cir. 2010) (holding that the prior art teaches away from the passive restraint system disclosed in the patent, rendering the patented invention non-obvious). Whether or not a reference teaches away is a question of fact underlying the non-obviousness finding. *In re Chapman*, 595 F.3d 1330, 1337 (Fed. Cir. 2010).

As to findings, the Court must "'presume that the jury resolved the underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if they are supported by substantial evidence.' *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995)." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, 711 F.3d 1348, 1369 (Fed. Cir. 2013).

In cases, like this, with a "black box" obviousness verdict, this Court provides "due deference to the jury, as always, in its role as the fact finder" and in its review of the facts, "regardless of whether they are explicit or implicit within the verdict." *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1342-43 (Fed. Cir. 2008). "Thus, even when the jury is given … a form that merely asks the jury to answer "yes" or "no" as to whether a claim is obvious…[this Court] presume[s] all factual disputes were resolved in favor of the verdict." *Id.*

# ARGUMENT

## I. The ’078 (“Camera Phone”) Patent: The District Court’s Decision Upholding The Verdict Of Infringement And Validity Should Be Affirmed

### A. The District Court Correctly Found That The Structure For The “Means...For Transmitting” Was Not Limited To A Telefax Modem

The claim 73 limitation at issue is:

> “means…for transmitting image information processed by said microprocessor to another location using a radio frequency channel”

The parties agree that the function is “to transmit a picture captured by the camera and processed by the processing unit to another location using a radio frequency channel.” A122.

Apple challenges the district court’s conclusion that the structure is a “‘*cellular mobile phone unit,’ or equivalents thereof*.” Apple would have the structure limited to one example in the patent (a *“telefax modem*”[6]), which was described for use in one type of network (an analog, as opposed to digital, phone network).

---

[6] Apple’s brief seems to equate the terms “modem” and “telefax modem,” even though references in the patent to “modem” do not always refer to a “*telefax* modem” used for facsimile functions. A21067(3:42-43 (“a modem is preferably connected to cellular mobile phone unit”); 3:43 (“data transmission properties are based on an analogue modem”)). For example, Apple cites to a non-precedential

The district court got it right. First, the patent *expressly* describes the use of a cellular mobile phone unit to transmit data:

> The notebook computer further comprises a radiotelephone, i.e., cellular mobile phone unit 17, preferably as an integrated part thereof. It is connected to cellular mobile phone controller 8 of data processing unit 2 and to receiver/transmitter antenna 18. In the case of a telephone set operating in an analogue cellular network, a modem is preferably connected to cellular mobile phone unit 17. *Cellular mobile phone unit 17 is based on the standard cellular mobile phone technology. Both <u>data</u> and speech can be transmitted via integrated cellular mobile phone unit 17.* The data transmission properties are based on an analogue modem and the GSM data interface, for instance, the technology of both of them being conventional.

A21067(3:37-49).[7]

According to this, the transmission of speech *and* data is accomplished by the cellular phone; and the "modem" is a preferred option where there is an *analog* cellular network, as opposed to the

---

opinion from a different case involving the '078 Patent, but then expressly states "it does not agree with this part of the construction." Apple-Br. 46 & n.5. "Modem" is not a fair substitute for "telefax modem." In any event, neither "modem" nor "telefax modem" is part of the structure for the transmission function.

[7] Of course, the term "data" here includes images from a camera. The specification says as much, describing the camera unit as a "data collection device." A21067(3:6-8). Apple acknowledges that "[w]hen the camera unit 14 captures a picture" there is "image data collected by the image sensor," Apple-Br. 10; and the district court construed "camera unit" as "a *<u>data</u>* collection apparatus for obtaining *<u>image</u>* information," A121, a construction Apple does not dispute here.

digital (GSM) network. It is notable that Apple fails to mention *at any point* in its argument on this issue that the specification only describes the modem as "preferable." Apple-Br. 43-52.

While the patent discusses both digital (GSM) and analog circuits, and says that the modem is preferable for use with *analog* networks, the use of qualifiers like "preferable," even for means-plus-function claims, suggests that the telefax modem is *not* a *required* component of the structure. For example, in *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004), which involved a rotating search light, defendant argued that the structure for the function "rotating said lamp unit in a horizontal direction" should be a lamp which rotates past 360° because the specification stated that "[i]t is highly desirable that the upper housing [unit] be free to rotate greater than 360° with respect to the base support unit." *Id.* at 1333-34. This Court disagreed, holding that "to the extent the assembly contains particular structures for permitting rotation through 360°…these structures are superfluous to our claim construction analysis because they are not required for performing the claimed function." *Id.*

Similarly, in *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325 (Fed. Cir. 2004), which involved bagging machines, defendant argued that the structure corresponding to the function of "creating air channels in the compost material in said bag to enhance the composting of the compost material" should include "both flutes and perforated pipes" because "[i]n most places the specification describes the invention as including both flutes and perforated pipe, and the drawings show both flutes and perforated pipe." *Id.* at 1328-29. This Court found flutes to be non-essential to the structure because the specification stated that "…it is *preferred* that both the flutes 46 and the pipe 50 be utilized." *Id.* at 1329.

Here, the '078 Patent's reference to a modem as a "preferable" addition to an analog mobile phone does not transform the modem into a *required* component of the structure, for both analog *and* digital networks.

Apple is wrong to argue that the fact that a box in Fig.3 refers to the transmission structure as "Cellular Mobile Telephone and Modem," requires that in *all* cases, the transmission of *everything* must go through both the phone *and* the modem. Apple-Br. 45 (citing A21063,

Fig.3). First, Fig.3 says nothing about a *telefax* modem. In the patent, the data transmission function is *directly* associated with the cellular mobile phone (whether through a modem or not). Image information is data transmission, while facsimile services are a different thing altogether:

> The functions related to the notebook computer include, for instance: telephone services which are based on the *cellular mobile phone* (*data transmission* and/or speech transmission properties), *facsimile* services, electronic mail, short message service/SMS,…as well as computer i.e., PC interface functions for transferring information to PC applications.

A21067(3:57-65). This discussion, that the cellular phone transmits both speech *and* data, shows that a POSITA reading this patent would know that the telefax modem was for *facsimile* services, not image data transmission.

Apple tries to make it sound like the use of a *telefax* modem here *was* the invention, when in fact, the term "telefax modem" appears only twice in the patent – first, in the passage describing "telefax functions" (above) which involves the user "writ[ing] notes on a paper" and then scanning those notes into memory using the camera unit, A21068(5:65-6:13); and second, in dependent claim 4, which claims "[a] device according to claim 2, wherein the cellular mobile phone unit comprises a

telefax modem," A21070. "Comprises" does not mean "is." It means "includes." The telefax modem is an *additional* component in claim 4. *Id.* (By way of comparison, claim 3, which also depends from claim 2, adds "wherein the cellular mobile phone unit comprises equipment required by speech communications…" A21070. Nowhere in the patent is there a suggestion that the invention is limited to, or even focused on, the telefax modem, which does not even function "to transmit a picture…*using a radio frequency channel*…," as required by the means-plus-function limitation. A122. There is nothing in the specification that suggests that the telefax modem can transmit information wirelessly, as does the cellular mobile phone unit.

Fig.3 also cannot be used to eliminate the *digital* telephone network disclosed in the patent, because a broader written description trumps a "single embodiment depicted in [a] drawing" when construing a means-plus-function limitation. *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005); *Micro Chem. Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("The statute does not permit…incorporation of structure from the written description beyond that necessary to perform the claimed function.").

Fig.3 merely illustrates the "preferable" arrangement described in text, in which a modem can "preferably" be attached to the cellular phone to provide an alternative means of transmission when a *digital* cellular network is unavailable. A21067(3:41-43).

Apple relies on one sentence in the patent, that "data transmission properties are based on an analog modem and the GSM data interface." Apple-Br. 45 (citing A21067(3:47-49)). But, Apple *crops* the full sentence, stopping right before two critical words that change its meaning – "for instance." The *complete* sentence is: "The data transmission properties are based on an analogue modem and the GSM data interface, *for instance*, the technology of both of them being conventional." A21067(3:47-49). In other words, these are examples. Given GSM is a digital telecommunications technology, the reference to "analogue modem and the GSM data interface" may best be understood to refer to analog communications using a modem, and *alternatively,* to digital communications using a cellular mobile phone unit. A57169 (describing GSM 4.08 as "European *digital* telecommunications system…"). The patent discusses both analog and digital phone

networks because, as the patent states, sometimes a digital cellular network is unavailable. A21067(3:41-43).

Apple's focus on "bitmaps" is a bit surprising here, because this is all attorney argument in the guise of expert testimony. A bitmap is a computer file format used to store image information (similar to a jpeg or gif). The specification calls bitmaps "the simplest alternative" for saving image information on the disclosed device because bitmaps are *compatible* with facsimile transmission over a modem. A21068(5:59-64). This endorsement of bitmaps is hardly remarkable, given that the patent discloses a modem as a "preferable" alternative for transmission on an analog cellular mobile phone network. But nothing about bitmaps implies that a telefax modem is a *necessary* component of the transmission structure, because bitmaps can just as easily be transmitted via a digital cellular phone. Indeed, a bitmap is merely one possible "alternative" image format, and the specification contemplates the possibility that image information could be stored in other formats – including those which cannot be transmitted over a telefax modem.[8]

[8] Apple notes, as though important, that the patent examiner in the re-examination of the '078 Patent believed at one point that the transmission of image information via email concerned image

*See, e.g.*, A21068(5:59-65) (describing bitmap as merely the "simplest alternative" format in which to store image information, and noting that bitmaps are used in facsimile/telefax transmissions).

Finally, none of Apple's cited cases compels a different claim construction. In *Medtronic*, this Court found that the structure for performing the "connecting adjacent elements together" function was a "helical winding." The Court eliminated "straight wire, hooks, and sutures" as possible structure because "their function, as made clear in the specification, is not to connect adjacent elements of the helix together, but to prevent overstretch of the formed coil." 248 F.3d at 1313. "Indeed," the Court noted, "there is no disclosed embodiment or described application of the overstretch prevention structures to a helix in which adjacent coils or elements are not already connected independently of the overstretch prevention structures." *Id.* Here, unlike *Medtronic*, the specification describes the "cellular mobile phone unit" as performing the function of "transmit[ing] a picture captured by

---

information acquired from the digitizer pad. Apple-Br. 36. Apple fails to mention, however, that the applicant responded that this was wrong, citing some of the same portions of the patent discussed herein. A30293-319. The examiner then allowed newly written claims 77-79 (concerning transmission of image information captured by the camera unit by email), implicitly recognizing his initial error. A21077.

the camera and processed by the processing unit to another location using a radio frequency channel." A122. As such, while in *Medtronic* "one skilled in the art would not perceive any clear link or association between these structures and the function of connecting adjacent elements together," *id.*, here there is a link between the "cellular mobile phone unit" and the recited function.

Apple's other cases are equally uncompelling. *Fonar* simply stands for the proposition that the structure will be limited to the structures actually disclosed in the patent. 107 F.3d at 1551. In *Braun,* this Court found nothing in the specification that indicated that the "valve seat structure" performed the recited function, and so did not include it in the structure of the means-plus-function term. 124 F.3d at 1426. In *Saffran v. Johnson & Johnson*, 712 F.3d 549 (Fed. Cir. 2013), this Court noted that "the question is not what structures a [POSITA] would know are capable of performing a given function, but what structures are specifically disclosed and tied to that function in the specification." *Id.* at 563.

Here, the specification discloses that a cellular phone performs the function of "transmit[ting] a picture captured by the camera and

processed by the processing unit to another location using a radio frequency channel." The patent does not require that the image data be transmitted by a telefax modem. The district court's claim construction was correct, and the jury's infringement finding should be affirmed.

### B. The District Court Correctly Found That The Structure For The "Means For Processing And For Storing..." Need Not Be "Dedicated" To Performing *Only* Those Two Functions

The other limitation at issue in claim 73 is:

> "means for processing and for storing at least a portion of the image information obtained by the camera unit for later recall and processing."

A21073. Apple does not take issue with the construed function:

> "to process an image captured by the camera unit and to store at least a portion of the processed image information in said at least one memory unit of said camera unit for later recall"

A122. However, it does challenge the district court's identification of the structure as: "*the image processing unit and memory unit*."

Apple argues that the claimed processing and memory units must be "*dedicated*" solely to the camera unit, and not perform any function besides processing and storing the images captured by the camera unit. Notably, Apple's argument actually appears to be an impermissible

argument about the *function* of this means-plus-function element, concerning what the structures must *do*, rather than what the structures are. But Apple cannot take issue with the district court's construction of the function here, both because it is waived and because Apple's proposal to the district court was similar to the current construction: "to process a picture captured by the camera and to store it for later recall." A1629. Apple did not propose to the court that the function include a "dedicated" limitation. *Id.*

Apparently relying on Figs. 3 and 5, Apple's key argument seems to be that because the microprocessor and the memory unit (the structure of the "means for processing and storing") are a constituent of the "camera unit" (that is, because claim 73 recites the "camera unit comprises:…means for processing and for storing…"), that the microprocessor and memory unit cannot serve any other purpose in the combined camera phone. But Apple is wrong. There is no basis for Apple to argue that the figures – or any other part of the patent – *require* the processor to be "dedicated" solely to processing images from the camera unit, or that the memory unit be "dedicated" to storing images from the camera.

In the patent, processing image information is said to involve a "number of memory units." A21067(4:25-31,51-54). For example, the patent notes that these memory units may comprise different varieties of memory, including, "DRAM and SRAM units used as scratch pad storages, and non-volatile memory units, such as FLASH and EPROM units which are used as base program memories." A21067(4:37-41). Nowhere does the patent suggest these memory units function *solely* for the purposes of the camera unit; the patent never uses limiting language to restrict the other uses of these various types of memory.

Apple's citations to the patent are misleading, at best. *See* Apple-Br. 54-55. While the cited provisions explain that image information is stored in *a* memory unit, they say nothing about the memory unit being *only* for the use of the "camera unit." For example, col. 4, ll. 37-41 says nothing about whether these memory units are dedicated solely to the camera unit:

> Memory units 24 preferably comprise two kinds of memory units: volatile memory units,, such as DRAM and SRAM units used as scratch pad storages, and non-volatile memory units, such as FLASH and EPROM units which are used as base program memories …

A21067(4:37-41).

Similarly, Apple argues that because the specification says that microprocessor 23 is the camera unit's processor, (and it is different from the general-purpose central processor 4), the microprocessor can have no other purpose. Apple-Br. 54-56. But, this cited passage does *not* say that the microprocessor 23 is a "dedicated" microprocessor, or that it cannot be used for other functions. Again, just because the patent includes a central second processor doing other things, does not mean that the camera's microprocessor cannot be used for other purposes, even if part of the camera unit.

By trying to add the "dedicated" limitation to the "means for processing…," Apple is trying to add more structure than is necessary to perform the function. But, as this Court has found, "the statute does not permit…incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem.*, 194 F.3d at 1263.

Apple's citation to the prosecution history adds nothing. The two sentences Apple cites say nothing about processors or memory units, let alone "a processor and memories dedicated to the camera unit that were separate from the system level processor and memories," as Apple

argues. Apple-Br. 56. Instead, the cited paragraph mentions that in *previous* inventions, a camera unit had limited functionality. A21573-74. In the '078 Patent, by contrast, the camera unit is more powerful; for example, it can perform character recognition. A21068(5:7-13). There is no indication in the cited sections that the microprocessor must be "dedicated" to the camera, or that it cannot perform other tasks.

The district court correctly determined that the structure associated with the "means…for processing and storing" function is a processing unit and a memory unit that does not have to be "dedicated" to the camera. The jury's determination should be affirmed.

### C. Substantial Evidence Supports The Jury's Finding That The '078 Patent Was Not Obvious

Apple next asks the Court to reverse the district court's denial of JMOL of obviousness, and to overturn the jury verdict that Apple had not proven claim 73 obvious in view of *Kyocera* and *Lucent*. Notably, Apple no longer contends that the claimed invention was not novel.

Apple simply mischaracterizes the record when it states that "the underlying facts are undisputed." Apple-Br. 60. Indeed, the facts supporting the jury's finding were *heavily* contested at trial, and there is substantial evidence in the record to support the jury's finding that

Apple failed to present clear and convincing evidence that the patent claim was obvious.

First, there was substantial evidence at trial that *Kyocera* and *Lucent*, even taken together, were *missing* limitation [f3]: "means for processing and storing at least a portion of the image information obtained by the camera unit for later recall and processing…" Apple's failure to prove that element was shown in the prior art, alone is fatal to its case.

The issue was squarely presented to the jury. Apple's expert (Dr. Grimes) testified that *Kyocera* supposedly included the [f3] "means for processing and for storing…" limitation because it contained an image processing circuit and memory. A20342(1264:11-1265:8). But MobileMedia's expert testified that the element was not disclosed at all, because *Kyocera* never stored its image data in memory "for later recall," as the function of this means-plus-function limitation required. Rather, *Kyocera* sent the image data *immediately* from the device's memory to a cellular tower:

> Q. …And then what about the last element, F3, means for processing and storing the image information obtained by the camera unit for later recall and processing? *Is that in Morita [Kyocera]*?

> A. *I can't see it*. We have stored, stored the image in the internal memory 26. We know that. We can argue about how it went there, but that's where the image resides. *And later recall and processing is not happening*. It's going straight out through the cell tower and is gone.

A20461-62(1383:22-1384:6); *see also* A20457-61(1379:16-1383:21). In other words, *Kyocera* only used the memory as a pass-through storage for an image being sent through the device; it did not meet the "for later recall" requirement of the claim. This makes sense, given the problem *Kyocera* sought to address; the infeasibility of the storage of pictures in the camera's memory. *Kyocera* itself says this, noting the device allows for "*immediate* transmission of photographed images to a large-scale storage medium located in another place using telephone lines." A57599.

Nor did *Lucent* provide this missing limitation [f3]. The jury heard no evidence from Apple that *Lucent* included the "means for processing and storing…" limitation.[9] In claim charts Apple submitted

---

[9] When MobileMedia pointed this out in the JMOL briefing, Apple responded that its expert "testified" on this element through his generic testimony walking through the claim. *See* A18969-70 (citing A20349-50(1271:13-1272:19)). But the cited testimony relates to the "microprocessor" limitation [d], not limitation [f3]:

with its JMOL briefing, it said that *Lucent* disclosed the "means for processing and storing…," element by the "CCD Conversion, Timing and Control 204" and "RAM 207," along with their corresponding descriptions. A18764. But there was no testimony at trial supporting a finding that any of these structures meet the "for later recall" portion of the means-plus-function limitation. While Apple's expert did mention a "CCD" element in *Lucent*, that was in describing that the output of the CCD is sent to a "processing circuit" for "processing of the information coming from the CCD…" A20349(1271:20-25). His testimony later was that this "processing circuit" was the DSP 205 in *Lucent*. A20351-52 (1273:25-1274:3 ("…the image output from the CCD, which is the imaging array, is processed in microcontroller [DSP] 205.")). Now,

---

> And the reddish color here is a microcontroller. Microcontroller, as I mentioned on Friday, is one of many names for a microprocessor. It also says DSP, which stands for digital signal processor. That's yet another name for a microprocessor. And then there's a, in purple here, is the interface and the information for connecting to a telephone line (indicating). That corresponds to the cellular phone in the '078 patent.

A20350(1272:6-19). While Apple's expert pointed to elements in *Lucent* that supposedly met the "microprocessor" and "means for transmitting" limitations," he never pointed to *Lucent* as meeting the "means for processing and for storing" limitation [f3]. *Id.*

Apple alleges that the DSP 205 is the "microprocessor" limitation [d] – not the separate and distinct "means for processing and storing…" limitation [f3]. Apple-Br. 65. There simply is *no* testimony that the DSP 205 or the CCD 204 meets the "for later recall" requirement of the function of the means-plus-function limitation [f3].

But, even if *Lucent* and *Kyocera* together disclosed all of the claim limitations (which they do not), Apple "still needed to proffer evidence indicating why a person having ordinary skill in the art would combine the references to arrive at the claimed invention." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1366-67 (Fed. Cir. 2012) (noting that "some kind of motivation must be shown from some source, so that the jury can understand why a person of ordinary skill would have thought of either combining two or more references or modifying one to achieve the patented [invention]"). This is a question of fact. *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1303 (Fed. Cir. 2010).

Here, the district court found that there was substantial evidence at trial that a POSITA, using his or her expertise and knowledge, would not have thought the claimed invention obvious in view of *Kyocera* and

*Lucent*. That evidence included the complexity of the patented device, and that the combination of camera and phone was beyond the level of those of *ordinary* skill at the time of the invention. A59.

Apple re-argues here, as though this Court is a new jury, that it would have been obvious to replace *Kyocera*'s "control circuit" with the microprocessor in *Lucent* ("DSP 205").[10] Apple says that its expert put forward evidence of a motivation to combine *Kyocera* and *Lucent*, such as performance and cost advantages, and functionality similarities. Apple-Br. 66-67. But Apple's expert's testimony amounted to bald statements. A20352(1274:21-22); A20353(1275:21-22). And all of this evidence was presented to the jury, and rejected.

At trial, MobileMedia's expert was asked for his response to Apple's expert's opinion. Meldal first cautioned that Apple's analysis relied on hindsight. He then testified, putting himself into the mind of the POSITA in 1994:

---

10 Apple has expressly waived any obviousness argument based on *Kyocera* in combination with the knowledge known to a POSITA at the time. Apple-Br. 64 n.8. Further, there is substantial evidence in the record that even if the "microprocessor" element was known to those of ordinary skill at the time, the substitution of a "microprocessor" into the *Kyocera* device would have been beyond the skill level of a POSITA. A20464-68(1386:8-1390:5).

A. Obviousness is a tricky business because hindsight is always 20/20. We have to put ourselves back in the time of the patent. This was 1998, I believe.

Q. 1994.

A. 1994. Indeed. This is in 1994…And you have a person of ordinary skill in the art at the time, which it seems that all the experts are in fairly close agreement on what that is. A B.S. degree in electrical engineering, computer engineering, computer science, software engineering, and two years of experience in the – in the field.

… They take *four years of education degree and then they go out into industry*. And I had been working at the California State University, which essentially has a broad swath of students. We bring in students from all walks of life. So I understand what an average student is.

A20464-65(1386:8-1387:12).[11]

Meldal then testified that, in his opinion, a POSITA *at that time* would not have had a reason to combine *Kyocera* and *Lucent* because they would *not have been capable* of combining, "a microprocessor adapted to control the operations of the camera unit…" with the disclosure in *Kyocera* to arrive at the invention. A20463-66(1385:25-

[11] Apple takes issue with this testimony, but Apple misses Meldal's point – that he had a foundation on which to testify that a POSITA in that time period would not have had the skillset to modify the control circuit architecture in *Lucent* by replacing it with a complex microprocessor; that they were two different architectures.

1389:19). He testified that it would have required more expertise than that possessed by persons of ordinary skill in the art in 1994:

> Now, bringing all of that back to 1994, microprocessors as such was nothing new. So if Dr. Grimes' argument is simply stick a microprocessor in there, the microprocessor is *no big deal. It is what you do with it that is the tricky part. It is how you program it, how you put it together with the other components, and make it all work together. That's very complex*, can be, and is…So we're talking about a *fairly sophisticated software and hardware integration and development*. And I can tell you, my students in the nineties, some of them are very bright. Two years after graduation would be able to contribute to it, *but they could not come up with it and do that by themselves*.

A20465-66(1387:19-1388:13); *see also* A20463-67.

As the district court noted, Meldal "relied on the complexity of making the technology work together…Dr. Meldal's testimony was supported by sufficient evidence…" A59. This was a critical factual issue that the jury could have found in MobileMedia's favor, and substantial evidence on which the jury could have based its non-obviousness finding.[12]

---

[12] Given the district court's finding that Meldal provided sufficient evidence here, Apple turns to taking part of his testimony out of context, saying he said "using a microprocessor was 'no big deal'." Apple-Br. 65. What Meldal said was that microprocessors *themselves* were "no big deal," but that what made the invention non-obvious was that it would have taken much more than ordinary skill at the time of

Apple cites *KSR*, but without evidence to link the facts of that case to those here. Apple *argues* that the substitution of a microprocessor from *Lucent* into *Kyocera* would have been a "predictable use of prior art elements according to their established functions" (Apple-Br. 65), but it has no evidence to support that assertion. In fact, the evidence *here* shows that in the mid-1990s, the substitution of a microprocessor into the *Kyocera* architecture would *not* have been "according to known methods" and would not have been "predictable" or yielded "predictable results." Such persons would *not* have been able to "come up with [such a solution] and do that by themselves," as the task was "very complex" and required "fairly sophisticated software and hardware integration development." A20466(1388:8-13).[13]

---

the invention to make *Kyocera* work with a microprocessor, as a substitute for its rudimentary control circuit. Meldal testified that such a combination would have been "very complex" at the time of the invention, and would have required "fairly sophisticated software and hardware integration and development." A20465-67(1387:19-1389:19).

[13] Apple asserts that the '078 Patent inventor "admitted" that there were no surprising results associated with his invention. But the record that Apple cites is ambiguous. A19478(400:1 ("Q. You don't recall anything about the results of the '078 Patent being surprising results; *is that right*? A. *No*, sir.")). But even if the language was unambiguous, whether the results were surprising to the *inventor* is legally *irrelevant*

Apple also argues that the ’078 Patent “assumes the implementation details of a microprocessor were well known.” Apple-Br. 65-66. But again, Apple cites no evidence to support this bold claim. And, even if microprocessors were well known then, *that* says nothing about whether it would have been obvious at the time to replace the rudimentary control circuit from a conventional camera like *Kyocera*, with a complex “microprocessor adapted to control the operations of the camera unit,” and which was also adapted to “process image information received by the camera unit,” or make the complex microprocessor work with the old *Kyocera* conventional camera architecture.[14] Of course, the evidence was that *Kyocera* did not do this a mere six days earlier than the priority date here, and the jury could

---

to the issue of obviousness. *See* 35 U.S.C. § 103 (“Patentability shall not be negated by the manner in which the invention was made.”).

[14] *Western Unicon Co. v. Moneygram Payment Sys.*, 626 F.3d 1361 (Fed. Cir. 2010), does not suggest differently. There, this Court reasoned that a missing step could be performed by a prior art keypad, where the patent stated that the “electronic transaction fulfillment device” may be a prior art keypad. *Id.* at 1369. There was no evidence in that case that the combination of a keypad and the prior device would have been beyond a POSITA. Nor was there evidence that a POSITA would have had no reasonable expectation of success in making the combination. Here, by contrast, there was evidence that a POSITA could *not* have substituted a microprocessor into the *Kyocera* device.

consider that timing when considering whether the invention was obvious.

"The burden falls on the patent challenger to show by clear and convincing evidence that a POSITA would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007). The jury certainly had substantial evidence upon which it could make its findings.

## II. The '068 ("Call Handling") Patent: The District Court's Decision Upholding The Verdict Of Infringement And Validity Should Be Affirmed

### A. The District Court Correctly Construed "Listing" To Encompass A List In The Form Of A Matrix

Apple challenges the district court's construction of the "listing" limitation of claim 23:

> "listing said processing items available to the call on said display for each call"

– which the court construed as:

> "*the processing items are grouped together in an orderly fashion.*"

A91. Apple argues that a "listing" should be "a series of processing items displayed one after another[,]" and that a "list" necessarily excludes a "matrix."

Apple's proposed construction is not supported by the patent. The patent's fourth embodiment expressly shows processing items in "a list in which processings for each call are *arranged in a matrix*." A32744(13:3-5). Far from excluding a matrix, the "list" explicitly encompasses it. A32736 (Figs.10A-10B):

FIG. 10A

FIG. 10B




Apple argues that because the specification at times discusses "list" and "matrix" as alternative embodiments, the terms must be construed to be mutually exclusive. But, the specification also says that a matrix is a subset of a "list." A32744(13:1-5)("When the call control key is pushed by the user in this state, a call control screen shown in Fig.10B is displayed. In this case, as in the call control screen, a list in

which processings for each call are arranged in a matrix is displayed just as the case with the second embodiment."). The specification uses "matrix" in connection with certain embodiments, not in contrast with "list," but to explain the format of a list that is being employed.

The district court's construction for "list" does not raise any claim differentiation problems. As Apple observes, "listing" is appended as a limitation to certain claims, including claim 23, which discuss "displaying" processing items. *See, e.g.*, A32476(18:30-46); A32747 (19:10-14); A32751(4:17-36). According to the court, a "listing" is an orderly grouping, while "displaying" does not connote any sense of ordering. A91. The "listing" limitation is not superfluous because it defines a specific manner (*i.e.*, an orderly manner) in which processing items are displayed. *See, e.g.*, *Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330, 1342 (Fed. Cir. 2010) (holding that claims are not superfluous when they impose additional limitations not found in other claims).

Notably, even under Apple's proposed construction for "listing," the verdict would stand. Apple argues that a "list" entails items that are displayed "one after the other." Apple-Br. 69. The accused devices

*do* arrange the "Merge" and "Swap" icons one after another, although in a row, rather than a column:




**MultipleCallConnected UI**
A5410 (annotated)

Because of this, Apple *now* argues that items in a list must *also* have a "single or linear spatial relationship," and that its icons are not so arranged. Apple-Br. 75. But Apple never asserted this additional limitation below, and thus, this proposed new construction is waived. *See Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262 (Fed. Cir. 2013). In any case, the "Merge" and "Swap" icons meet this additional new limitation as they are displayed one after the other in a linear spatial relationship.

In response, Apple cites to a graphic from one of its summary judgment briefs, in which Apple purported to summarize part of MobileMedia's expert's report as to three prior art references. Apple-Br. 75-76. Apple apparently believes that an excerpt it prepared from a validity opinion entitles it to summary judgment of non-infringement. Yet Apple does not mention the fact that Meldal's report was written *before* claim construction, and that Meldal gave an affirmative opinion and explanation that the iPhone practiced the list limitation (A8287-88). Further, Apple's point that the "End" key is not part of a "listing" because it is in another location is a red herring because Meldal did not identify the "End" key at trial as a processing item. His "list" concerned the "Merge" and "Swap" keys, which are obviously in a listing format. A19690(612:16-25); A19692(614:13-23); A19696-97(618:16-619:19).

The jury could easily determine, with our without the aid of expert testimony, that the iPhones displays call processing items (i.e., Merge and Swap), in a list one after the other. Regardless, the district court's construction was correct.

### B. Substantial Evidence Supports The Jury's Finding That The '068 Patent Was Not Obvious

Apple does not argue that claim 23 is not novel. Rather, Apple argues that this Court should overturn the district court's refusal to grant JMOL. Apple asks this court to ignore MobileMedia's evidence and hold there was no substantial evidence for the jury to conclude that *Bayless* (alone), in conjunction with the knowledge of a POSITA, did not render claim 23 obvious.

In fact, Apple merely re-argues the case here that it presented to the jury – that *Bayless*'s *two* step "Hotkey operations" – "Ctrl" followed by "0" – was equivalent to single-key selection operation, and that the equivalence would have been obvious in 1996.

But, Apple presented <u>no</u> evidence of this so-called equivalence at trial. Its expert, Dr. Balakrishnan, provided nothing more than a conclusory statement that "one of skill in the art would just know from the field that this is something that ordinarily would be done, so it would be obvious to do that." A20045(967:7-10). *Balakrishnan provided no other evidence on this issue.* Such conclusory statements are simply insufficient, as a matter of law. *See, e.g.*, *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (mere conclusory statements

cannot sustain an obviousness argument); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (holding that the district court did not err in granting JMOL of no invalidity where defendant's expert on obviousness provided only conclusory and factually unsupported testimony); *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999) ("Skill in the art does not act as a bridge over gaps in substantive presentation of an obviousness case, but instead supplies the primary guarantee of objectivity in the process.").

Indeed, Apple's expert admitted that *Bayless* says nothing about a single-key selection operation:

Q. *Bayless* says nothing about an F1 [single] key, does it?

A. *Bayless* does not say that in words, no.

A20073(995:21-22). And, he conceded that *Bayless* only described a two-step, two-key selection operation, *i.e.* sequenced, multi-key selection operations. A20074(996:1-4).

MobileMedia, on the other hand, gave the jury substantial evidence that *Bayless,* in fact, taught away from the patented invention. A20490-92(1412:25-1414:5). First, the jury heard that 16 months separated *Bayless* from the patent, and apparently in that time, no one

else had recognized the simplicity of the patented one-step operation. In addition, MobileMedia's expert highlighted that *Bayless's* computer keyboard-user interface faced very different design challenges, compared to the cell phone of the '068 Patent: "For instance, on a cellphone, ease of use is very important. On a computer with a full keyboard, you have different issues that you may want to give greater weight to." A20491-92(1413:24-1414:2). Because keyboard space was not an issue in *Bayless*, it approached the problem in a different way than the '068 Patent. A20490-92(1412:25-1414:5); A20558-59(1480:12-1481:13).

Lacking *evidence*, Apple now cites to district court cases that it says prove that a single-key selection operation was commonplace at the time. Apple-Br. 81. But, this "evidence" was not presented to the jury and, in any event, is not relevant here given that Apple's expert conceded, and the jury heard, that the PTO allowed the patent over *Bayless* precisely because *Bayless* requires "a two-step procedure" rather than the "single…selection operation" described in claim 23. A20094(1016:8-22); A43439; A43441; *see also* A20086(1008:16-24); A20092(1014:3-6); A20094-95(1016:16-1017:1). Apple offered the jury

no evidence that it would have been obvious to convert the sequenced, two-key operations *Bayless* used, to a single-key operation as described in the patent for a cell phone.

Apple also argues that MobileMedia's expert improperly testified that pressing two keys sequentially is not a *single* "selection operation." Apple-Br. 83-84. Apple contends that this testimony somehow improperly equated the terms "key" and "operations." But, the district court considered and rejected this argument, finding that "Apple's argument that the '068 patent accords different meanings to 'keys' and 'operations' is a new claim construction argument, brought to the court's attention for the first time after the jury verdict." A40.[15] There is no basis to second guess the district court's conclusion that Apple was improperly switching claim constructions after trial.

In fact, MobileMedia's expert explained at trial that the Hotkey depicted in *Bayless* is actually two keyboard selection operations, in which processing items are displayed only after *two* physical keys are

---

[15] In rejecting Apple's argument, the district court noted that "Apple never sought a construction to draw a distinction between a 'key' and an 'operation.'" A40. The district court also noted that Apple sought the same construction for "predetermined operation key" and "predetermined selection operation" in the parties' joint claim construction statement. A41-42; A1637.

pressed in a *serial sequence* – "Ctrl" followed by "0." A20486-88 (1408:12-1410:1); A20558-59(1480:12-1481:13). That was in contrast to claim 23, which required displaying processing items "when only a *single* predetermined selection operation is made by the user." A32751(4:32-33).

In view of Meldal's testimony, A20490-92(1412:25-1414:5), the jury could reasonably conclude that Apple's evidence was insufficient to make a clear and convincing case of obviousness.

## III. The '075 ("Call Rejection") Patent: The District Court Should Not Have Overturned The Verdict Of Infringement And Validity

### A. The District Court Misapplied Its Claim Construction In Overturning The Verdict Of Infringement

Turning to the first of the two patents MobileMedia cross-appeals, the district court erred when it granted JMOL of non-infringement of claims 5, 6 and 10 of the '075 Patent, misapplying *after* trial its own claim construction.

Prior to trial, the district court had construed the term:

> "…the wireless system is to immediately release the incoming call on the communication channel between the mobile phone and the remote transceiver."

– to mean:

> "*the wireless system must, without requiring any additional action by or communication from the mobile phone, 'release the incoming call on the communication channel between the mobile phone and remote transceiver.*"

A101. The court construed the "immediately release" limitation to have no temporal restrictions, and instructed the jury accordingly. A18585; A20763(1685:15-23); A20764-65(1686:17-1687:1).

At trial, MobileMedia provided significant and substantial evidence that the iPhone met this limitation. Specifically, MobileMedia's expert testified that the DISCONNECT message sent by the iPhone includes a clearing message ("cause information element #17 (User Busy)") which indicated to the wireless system that it must then release the incoming call on the communication channel, without requiring any additional action from the iPhone. A19660-62(582:14-584:7); A19669-74(591:1-596:20); A19681(603:2-12); A56455-56(§5.4.3.5); A56250(§1.3.1).

In addition, *Apple's* expert, Dr. Akl, testified that the DISCONNECT message would cause a RELEASE message to be sent to the phone, *and* would start a timer at the cell tower base station which, if it expired twice, would cause the cell tower to release the call. A20208-11(1130:12-1133:2); A56455-56. Because the "DISCONNECT"

message contained an "information element" that indicated to the wireless system that it had to release the incoming call without waiting for additional communication or action from the iPhone, the jury was well-justified to find that the iPhone infringed the patent.

Given this evidence, the district court overturned the jury's verdict, despite noting MobileMedia presented evidence supported a finding of infringement given the claim construction presented to the jury:

> Although MobileMedia offered evidence that cause 17, the alleged "information element," is "sufficient" to cause the base station to immediately release a call in the abnormal case, it did not offer any evidence that cause 17 indicates that the wireless system "must" release a call without requiring additional action by or communication from the mobile phone.

A34.

According to the claim construction, MobileMedia's "sufficient to cause release" evidence *alone* was enough to sustain the verdict. The district court was wrong to require more, given the claim construction, and to grant JMOL because MobileMedia "did not offer any evidence that the cause 17 indicates that the wireless system 'must' release a call."

But, importantly, MobileMedia *did* offer such additional evidence. MobileMedia's expert testified that the DISCONNECT message sent by the iPhone *does* include a clearing message ("cause information element #17 (User Busy)") that indicates to the wireless system that it *must* release the call without requiring additional action from the iPhone. Specifically, Meldal testified that the DISCONNECT message would start a timer at the cell tower base station which, after expiring twice, would cause the cell tower to release the call. A19660-62(582:14-584:7); A19669-74(591:1-596:20); A19681(603:2-12); A56455-56; A56250. And, *Apple's* expert, Dr. Akl, testified to the same effect:

> Q. And once it [the wireless carrier] receives that disconnect message and begins those two things, the release message and the timer, that call is going to be disconnected all the time?
>
> A. Sure.
>
> Q. 100 percent. That disconnect message alone has all the information necessary to drive the system to disconnect that second call; is that right?
>
> A. Eventually.

A20209-10(1131:19-1132:1); A20208-11(1130:12-1133:2). Akl thus conceded that the DISCONNECT message provides *all* the information

necessary to release a call, and that once the process begins, nothing can stop it – in other words, the call *is* going to be disconnected, *every* time.

In granting JMOL, the district court seemed to believe that the information in the "DISCONNECT" message does not cause the "immediate release" of the call because the base station has to wait for a timer to expire twice before releasing the call. A34. But, the court's construction of the "immediately release" limitation had nothing to do with the amount of time before the incoming call is released. A101-02; A18585. Both MobileMedia's and Apple's experts agreed that the court's construction of the "immediate release" limitation had no temporal restrictions. A19659-60(581:16-582:13); A20210(1132:2-10). The fact that the base station waits for a timer to expire is not relevant to the infringement issue – the claim only requires no "additional action by or communication *from the mobile phone*." A101. And the testimony was unequivocal – the call is released without any additional activity from the phone.

The court construed the claim, and the evidence at trial fully supported a finding of infringement of that claim, as construed. The district court simply was mistaken when it rejected MobileMedia's

evidence as insufficient. The district court's grant of JMOL should be reversed.

### B. The District Court Erred By Granting JMOL Of Invalidity

At trial, Apple conceded the invention was novel, arguing only that the combination of two distinct GSM documents – *GSM 04.08* and *GSM 04.83*, or alternatively, the combination of *GSM 04.08*, *GSM 04.83*, and the *'068 Patent*, rendered the claimed invention obvious. The jury heard this evidence, and rejected it. The district court was not free to ignore the jury's verdict, and substitute its own views here.[16]

The central issue at trial, in the JMOL briefing, and in the district court's JMOL decision, was whether a POSITA at the time of the '075 Patent would have been motivated to combine the prior art *GSM 04.08* and *GSM 04.83* references to arrive at the claimed invention. The district court recognized that the central issue "is limited to whether there was sufficient motivation to combine," but then, after the jury implicitly answered that question, overturned the jury, making its own

---

16 GSM 4.08 and GSM 4.83 stand as separate prior art references. The district court so ruled at summary judgment. A109-10. This Court has also ruled the same when faced with multiple GSM documents. *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1351 (Fed. Cir. 2008) ("the GSM standard is not a single reference").

finding that the evidence was insufficient to support a validity verdict "over GSM 04.83 and GSM 04.08, with or without the additional '068 patent reference." A25.

Indeed, the issue of motivation to combine was a hotly contested one, on which both sides presented significant evidence. MobileMedia offered substantial evidence that a POSITA in 1998 would have been "discouraged" from using GSM 4.08 in combination with *GSM 4.83* and the '068 Patent (teaching two active phone calls). A20474(1396:6-12). Among other reasons, that was because *GSM 4.08* stated that the "equipment sending [Cause No. 21 'Call Rejected'] is <u>*neither busy*</u> nor incompatible...," and this would have discouraged a POSITA from combining, with *GSM 4.08*, references that teach a second incoming call (equipment that <u>*is*</u> busy), such as *GSM 4.83* and/or the *'068 Patent*:

> A. ...That means I'm busy. This is an inappropriate message. This does not speak to me...[t]his message is only sent with it is not busy, when a mobile phone is not busy...
>
> Q. ...[w]ould it have been obvious to them to use 4.08 to generate a call rejection for a second call?
>
> A. No.

A20474-78. The jury saw the text of *GSM 4.08*, and was told that it would have indicated to a POSITA that the mobile phone is not busy on an active call when Cause No. 21 "call rejected" is sent. A57560. The jury weighed the competing testimony, made credibility determinations, and accepted MobileMedia's evidence. The jury found that Apple had not proved the claims obvious.

Importantly, in its JMOL decision, the district court *agreed* that there was substantial evidence of non-obviousness, namely, that Meldal's testimony amounted to an expert opinion that *GSM 04.08* "would have led to a dead end because GSM 04.08 discouraged or taught away from rejecting a second incoming call while the phone was already connected to a first call…," and that "*the jury was free to find that GSM 04.08 teaches away from handling second incoming calls while connected to a first call.*" A25-26.

This finding, alone, should have precluded JMOL. Yet, the district court reversed the verdict, concluding that Meldal –

> did not offer any further reasoning to rebut Apple's evidence that a person of ordinary skill would have found it obvious *when starting with GSM 04.83* (rather than GSM 04.08) to combine GSM 04.83 and GSM 04.08…MobileMedia's evidence *only related to starting with GSM 04.08*…MobileMedia's evidence did not consider that a

> person of ordinary skill in the art is presumed to have knowledge of _all_ prior art references and could thus start with GSM 04.83 and follows its instructions to use GSM 04.08, rate than considering GSM 04.08 first and hitting a dead end.

A26(emphasis in original). In other words, the court concluded that while Meldal convincingly testified that it was not obvious to combine *GSM 04.08* with *GSM 04.83*, he should *also* have testified it was not obvious to do the reverse – combine *GSM 04.83* with *GSM 04.08*.

But, *there was no evidence that this would have made any difference. Apple's* witness never made this argument. The district court made this distinction up from whole cloth. Nor is there a basis in the law for such a semantic analysis. In the obviousness analysis, the POSITA is presumed to know all prior art, and to combine it if he can. The district court and Apple cited no case below to suggest that the *route* to obviousness was relevant.

The district court seems to have been bothered by a belief urged on it by Apple, that MobileMedia's infringement theory conflicted with Meldal's invalidity opinion because, to prove infringement, Meldal relied on *later* versions of the same *GSM 4.08* and *GSM 4.83* documents (GSM 24.008 and 24.083, respectively), to prove that the iPhones

infringe (the GSM 24.008 and 24.083 documents dated from 2006 and 2004, respectively). A56260-785; A56242-59. According to the court, "MobileMedia's justification for relying on the GSM 23.083/GSM 24.008 combination was inconsistent with its assertion that GSM 04.83 and GSM 04.08 could not have been combined." A28.

The court seems to have improperly conflated the standard for proving infringement, with the standard for proving obviousness. *Infringement* is proven by showing that it is more likely than not that each and every claim limitation is present in the accused product. *Obviousness* is proven by showing clear and convincing evidence that a POSITA would have found the invention obvious in view of the prior art.

Even assuming *arguendo*, that GSM 24.008 and 24.083 were identical to their predecessor standards – *GSM 4.08* and *GSM 4.83* – there was no inconsistency in Meldal testifying that the *combination* of *GSM 4.08* and *GSM 4.83* failed to render the claimed inventions obvious, in *1998*. This is because in testifying on obviousness, Meldal put himself into the position of the POSITA at the time of the invention:

Q. …So I think his view was somebody in 1998 reading DTX-40 [GSM 4.08] would have known, it would have been obvious to use this standard to reject call for a second call. What's your view on that?

A. I disagree with him.

Q. Why?

A. In 1998, I was, again, going back to that time. 1998, I was a professor at an engineering school, and *so we were looking at the person of ordinary skill in the art* would be a graduate, roughly 1996, and then two years of experience in electrical, computer engineering, software engineering, those fields. *And the students with two years of experience would not have been able to go from this one and see how the – the invention would be implemented.*

A20473-74(1395:15-1396:5). The district court applied the classic case of hindsight – Meldal testified that in *1998*, it would not have been obvious to *combine* the two references to reach the claimed invention. In 2012, he testified that he could use the two portions of later versions of each reference, to show infringement of the individual elements, today.

The fact that Meldal in 2012 used these documents to explain to the jury how the constituent pieces of the iPhones work is not relevant to whether a POSITA in *1998* would have *combined* earlier versions of the same two documents to arrive at the claimed invention. These are

two completely different tests, and the district court was wrong to conflate the two.

Here, there was evidence that *GSM 04.08* taught away from *combining* it with *GSM 04.83*. There was *no* testimony at trial from *either* side on the need to analyze the order in which the references might be combined. Because teaching away is a question of fact, and the district court *agreed* MobileMedia's evidence was sufficient as presented, the jury's finding should have been affirmed.

The JMOL of obviousness should be reversed.

## IV. The '231 ("Call Alerts") Patent: The District Court's Summary Judgment Of Non-Infringement Should Be Vacated

### A. The District Court Wrongly Construed "To Change A Volume" In The Independent Claim To Exclude The Subset "Stopping The Sound," Which Was In A Dependent Claim

Finally, there is one patent MobileMedia appeals which did not go to trial – the '231. The district court granted summary judgment of non-infringement based on a claim construction that is wrong, because it excludes the subject matter of dependent claim 2 from its parent claim 12, in conflict with the specification.

Claim 12 requires an "alert sound generator" and a "control means" "[t]o change a volume of the generated sound." The district court construed "to change a volume of the generated sound" to mean "to alter the degree of loudness of the alert sound that is being generated without cutting off the telephone circuit." A115.

Claim 2, which depends from claim 12, adds "wherein said control means controls the state of said alert sound generator to stop the sound." The district court construed "stop the sound" to mean "stop the sound that is being generated without cutting off the telephone circuit," rejecting Apple's proposed construction of "to mute the alert sound that is being generated" because "the specification contemplates stopping the alert sound by way of stopping playback, not merely muting it." A114.

Claim 3, which also depends from claim 12, claims another option; "wherein said control means controls the state of said alert sound generator to reduce the volume of the sound." A57703.

The district court granted summary judgment because it considered claim 12's "change a volume of the generated sound" to exclude the "stopping the sound" option (which the iPhone did):

> Limitation 12d requires that "said control means controls said alert sound generator to change a volume of the

> generated sound." According to Apple…the iPhones – do not reduce, increase, mute, or otherwise change the volume of the audio playback; instead, they stop playback of the ring tone, or sound alert, file…As construed, the term "to change a volume of the generated sound alert" requires a change in the "degree of loudness" of the sound…Therefore, the accused iPhones do not practice a control means that controls an alert sound generator "to change a volume of the generated sound."

The district court thought that "changing a volume" and "stopping the sound" were mutually exclusive alternatives for quieting a ringtone. A116-17.

The court relied on two passages in the specification referring to cases where "an alert sound is stopped or the volume of an alert sound is *reduced*." A267-68(4:66-5:4,5:12-18); *see also* A115. But these passages clarify that *reducing*, not *changing*, a volume is the alternative to stopping the ringtone:

> Further, in the aforementioned embodiments (FIGS. 3 to 5), description has been made about a case where an alert sound is stopped or the volume of an alert sound is reduced continuously from immediately after the power key 3A is depressed for a short time under the condition that the alert sound is ringing. However, this duration is not only limited to just when the power key 3A is depressed but may be when after predetermined time…
>
> In the aforementioned embodiments, description has been made about a case where the alert sound stopping function and the volume reducing function is allotted to the power

> key 3A which is designed to cut off the power supply when the power key 3A is depressed for a predetermined time or more. However, the present invention is not limited to these embodiments but an additional key may be further provided so that the alert sound stopping function or the volume reducing function is allotted exclusively to this additional key, or the alert sound stopping function or the volume reducing function is allotted to any one of the abovementioned keys other than the power key 3A.

A57704-05(4:66-5:18). Notably, except in its independent claims, the specification _*never*_ uses the terms “change” or “changing” the volume. Claim 12 uses the broader phrase “change a volume” to encompass both of the preferred embodiments, in which a ringtone is either stopped or its volume is reduced.

Nevertheless, the court treated the claim 12 limitation as an alternative to claim 2, rather than as encompassing the “stop the sound” subject matter of claim 2, even though 35 U.S.C. § 112 requires “a claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.”); *Alcon Research, Ltd. v. Apotex, Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012) (scope of the independent claim had to be at least as broad as its dependent claim); *Intamin Ltd. v. Magnetar Techs., Corp.*, 483 F.3d

1328, 1335 (Fed. Cir. 2007) ("An independent claim impliedly embraces more subject matter than its narrower dependent claims.").

Here, the district court erred by interpreting an independent claim in a manner that was not broad enough to encompass each element of its dependent claims. The court held that stopping playback of an alert sound is outside the scope of claim 12, but within the scope of claim 2, which depends from claim 12. The district court then held that the products do not infringe claim 12 because they stop the playback of an alert sound, rather than "alter the degree of loudness" of the alert sound, as required under the court's construction of claim 12.

It is undisputed that iPhones permit a user to stop the generation of an unwanted ringtone. A116. A device "stops the sound" of a ringtone within the meaning of claim 2 when it keeps the ringtone from being generated in the first instance. A114-16. Because to "stop the sound" is one way to "change a volume," the accused devices meet claim 12's "change a volume" limitation.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's denial of JMOL on claim 73 of the '078 Patent and claim 23 of the '068 Patent; reverse the grant of JMOL with respect to claims 5, 6 and 10 of the '075 Patent; and reverse the district court's grant of summary judgment of non-infringement of the '231 Patent.

Dated: March 20, 2014

Respectfully submitted,

/s/ *Steven M. Bauer*

Steven M. Bauer
Justin J. Daniels
Safraz W. Ishmael
John E. Roberts
John M. Kitchura, Jr.
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
Telephone: 617-526-9600
sbauer@proskauer.com
jdaniels@proskauer.com
sishmael@proskauer.com
jroberts@proskauer.com
jkitchura@proskauer.com

*Counsel for Appellee-Cross-Appellant MobileMedia Ideas LLC*

## CERTIFICATE OF COMPLIANCE

Counsel for Plaintiff-Appellee MobileMedia Ideas LLC certifies:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains 16,427 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Word 2010 in 14-point Century Schoolbook.

Dated: March 20, 2014

Respectfully submitted,

/s/ *Steven M. Bauer*

Steven M. Bauer

## CERTIFICATE OF SERVICE AND FILING

I certify that on March 20, 2014, I electronically filed the foregoing, BRIEF OF PLAINTIFF-APPELLEE, CROSS-APPELLANT, using the Court's CM/ECF filing system, thereby serving opposing counsel pursuant to Fed. Cir. Rule 25(a) and ECF-2(d) of the Court's May 17, 2012 Administrative Order Regarding Electronic Case Filing.

Dated: March 20, 2014

Respectfully submitted,

/s/ *Steven M. Bauer*

Steven M. Bauer